HELEN. C. FRICK vs. ELLEN BOYD ROBERTS BOYD.

Essex.   January 5, 1966. — February 9, 1966.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Privacy.*

On the facts in a suit in equity between two women, no invasion of any common law right of privacy of the plaintiff was shown by the defendant's publishing to a limited extent, without the plaintiff's consent, a book of an autobiographical nature written by the defendant which included an account of a period of many years when the defendant was an employee at a working girls' home founded and supported by the plaintiff as a personal charity, with a few dignified pictures of the plaintiff and some quotations from her letters, and which in such account always referred to the plaintiff in highly favorable terms.

BILL IN EQUITY filed in the Superior Court on March 5, 1965.

Certain questions were reported by *Paquet, J.*

*Daniel F. Featherston, Jr.,* for the plaintiff.

*Abraham Glovsky (Robert H. Gordon* with him) for the defendant.

CUTTER, J.   Miss Frick seeks to enjoin continued distribution of a book by Mrs. Boyd entitled "Adventures in Sharing," and to obtain delivery of all copies.   She contends that the book invades her "right of privacy."

A judge of the Superior Court "received for . . . detailed study a copy of the book, [and] continued . . . [a] restraining order."   He later determined that "the existence . . . of the so-called . . . right of privacy in . . . Massachusetts underlay the . . . maintenance of the . . . [bill] and had not as yet been determined."   He reported the case to this court for determination of three questions of law, viz. (1) whether a common law right of privacy exists in Massachusetts; (2) if such a right does exist, a statement of "the elements of and defenses to [such] a cause of action"; and (3) whether the facts alleged show invasion of such a right.

The bill alleges certain facts which Mrs. Boyd admits. Miss Frick, prior to World War I, founded in Beverly a vacation retreat for working girls (the home) "and privately . . . supported it as a personal charity until . . . [it] was turned over to The Girls' Clubs of America, Inc. in 1954." Mrs. Boyd "was for many years an employee of the . . . [home] and in that capacity came to know" Miss Frick. In 1964, Mrs. Boyd "privately had [the book] printed . . . for public sale and distribution in an initial edition of" about 1,000 copies. The book, published without Miss Frick's consent, includes a "recounting of . . . [Mrs. Boyd's] years" at the home. Mrs. Boyd paid most of the printing expense "but still owes some money for" that work. Miss Frick had no knowledge that Mrs. Boyd was writing the book (but Mrs. Boyd asserts in her answer that she tried without success to inform Miss Frick about it). Upon receiving a copy Miss Frick notified Mrs. Boyd "that she strenuously objected to the book . . . and demanded that all further sale and distribution of the book be . . . stopped." Mrs. Boyd disregarded Miss Frick's objections and has sold copies of the book to the general public for $4.95 a copy for "gain and profit."

Miss Frick further alleges facts, which (doubtless because of the form of, and the conclusions in, the allegations) Mrs. Boyd's counsel felt it appropriate for her to deny. These allegations include the following. Miss Frick "endeavored to insure that her support . . . of the . . . [home] be a private and personal activity." She asserts that the "facts . . . relating to this activity were the concern only of those . . . involved directly with the operation . . . and that . . . [her] connection with the home . . . [was] a private matter in which the public had no legitimate concern." Miss Frick has "insofar as possible [lived] a quiet and private life, avoiding the prying curiosity of the public." All this "was and is . . . fully understood by" Mrs. Boyd. Miss Frick further avers that the book, the reproduction therein of photographs of Miss Frick and letters from her, and the sale of the book con-

Frick *v.* Boyd.

stitute "an . . . unwarranted appropriation of . . . [her] personality" and an "invasion" of her "right of privacy" which has caused her "mental suffering, anguish, shame, humiliation, demeanment, not only in her own mind . . . but also in her . . . standing among others and all persons of ordinary sensibility," who may read the book.

The book itself has been incorporated by the trial judge in his report. The dust jacket says that the author, a former social worker, in 1964 was in her eighty-seventh year. In 1909, she met Miss Frick. Thereafter Mrs. Boyd participated as an employee for some thirty years in the work of Miss Frick's commendable vacation home for girls. The home started out by assisting a small number of deserving young women, but it grew rapidly.[1]

The book starts out with a reminiscent account of Mrs. Boyd's childhood in Medfield, of incidents of her youth, of her church interests, and of her social service work. The account, although obviously not the work of an experienced author, is written with dignity and apparent sincerity. People mentioned are spoken of in terms of gentle kindliness.

Members of the Frick family first appear significantly in this 181 page volume at page 101. The account thereafter refers frequently, and always with enthusiasm and gratitude, to Miss Frick's generosity, her sense of social duty, and her unselfishness, and to the significance of her charitable enterprise.[2] Except by discussing Miss Frick's and her father's generosity to the home and to the author, and

---

[1] By 1940 the institution (in Miss Frick's own words in her letter to its members upon Mrs. Boyd's retirement in that year) had "become for many the only place on earth that can be called '[h]ome,' and because of Mrs. Boyd's genius, this [h]ome has been the inspirational source for greater ambition and greater effort along many lines. It would be impossible to estimate how many lives have been changed because of her [Mrs. Boyd's] unselfish interest, devotion, and untiring energy."

[2] There are photographs of activities of the home, and three wholly dignified pictures of Miss Frick in earlier years. One is a snapshot owned by the author, one a pleasant and somewhat formal photograph of Miss Frick and another young lady apparently given by Miss Frick to the author, and one a newspaper photographer's picture taken during World War I when Miss Frick undertook volunteer service in France.

telling of Miss Frick's active part in the home's affairs, there is slight comment on the Frick family. We perceive nothing which could reasonably tend to lower Miss Frick in the esteem of her friends or the general public. On the contrary, we think, the book would lead its readers to recognize the importance and usefulness of Miss Frick's charitable efforts and to share Mrs. Boyd's gratitude for Miss Frick's benefactions and good works. We recognize, of course, that Miss Frick modestly would have preferred to have no such published recognition of her charitable activity. It is not probable that those examining the book will think that Miss Frick had any share in its preparation.[3]

We conclude that the book is a proper, albeit somewhat rambling, autobiographical volume. In a limited way it is of historical interest. Naturally the author speaks of her thirty years of work with Miss Frick, by far her most important experience. In that fine work, as Miss Frick herself recognized (fn. 1), Mrs. Boyd made a significant contribution. Mrs. Boyd could properly describe fairly her contacts with the Fricks and others in the course of that work.

The venture was the type of charity usually treated as sufficiently important to the public welfare to justify tax exemption of its properties and income tax deductions for gifts made to it. See G. L. c. 59, § 5, Third, as amended through St. 1957, c. 500, § 1; Int. Rev. Code of 1954, § 170. Accounts of such a venture may be of legitimate interest to persons among the general public, including those who concern themselves with such institutions or are potential or past donors to them or beneficiaries of their activities. Nothing in Mrs. Boyd's account of Miss Frick seems to us

---

[3] There is only slight quotation of Miss Frick's letters. One, already mentioned (fn. 1), was plainly generally circulated in 1940 to a number of members of the corporation which conducted the home. One was a short note written to Mrs. Boyd in 1940, making or referring to a thoughtful, kind gift to her upon her retirement. It was the type of letter which the writer might reasonably expect the recipient in gratitude to show to many friends and relatives. It reveals nothing of Miss Frick's own affairs or her character beyond her generosity. Its publication, even if without permission, is plainly of insufficient significance to warrant equitable relief or damages.

to go unreasonably outside appropriate discussion of her participation in a quasi public charitable enterprise.

The book cannot be regarded as a usual commercial venture or as having been undertaken with any reasonable purpose or expectation of profit. Its contents are not likely to have any wide public appeal beyond Mrs. Boyd's family and friends and persons legitimately interested in the home. If, as is alleged, copies have been offered for sale, we properly may infer that it was with the hope of modest receipts to help in defraying publication costs. Miss Frick "acknowledges that the book . . . does not contain anything . . . defamatory."

The Massachusetts cases have not involved situations making it necessary to decide whether and to what extent any nonstatutory right of privacy exists within the Commonwealth. *Thayer* v. *Worcester Post Co.* 284 Mass. 160, 163. *Marek* v. *Zanol Prod. Co.* 298 Mass. 1. *Themo* v. *New England Newspaper Publishing Co.* 306 Mass. 54, 55 (where it was said, "Great difficulty exists in defining a right of privacy that will protect individuals against abuse and yet will not infringe the right of the public and the press to discuss personalities"). *Kelley* v. *Post Publishing Co.* 327 Mass. 275, 277–278. See, however, *Wright* v. *R. K. O. Radio Pictures, Inc.* 55 F. Supp. 639, 641 (D. Mass.). See also *Sperry Rand Corp.* v. *Hill,* 356 F. 2d 181 (1st Cir.).

In the *Thayer* case, 284 Mass. 160, 164, a distasteful and potentially defamatory publication was spoken of as not relating "to violations of privacy which would involve acts in the nature of nuisance." In the *Kelley* case, 327 Mass. 275, 278, it was said, "The law does not provide a remedy for every annoyance that occurs in everyday life. Many things which are distressing or may be lacking in propriety or good taste are not actionable." In that case, concerning a publication likely to have greater circulation, and to cause more poignant distress, than the book now before us, we said concerning privacy, "[I]f there is such a right in this Commonwealth we would not be prepared to extend it to a case like the present."

Frick *v.* Boyd.

Despite the exhaustive collection and discussion of pertinent authorities in the briefs of the parties,[4] we need not consider them.   It will be time enough to appraise these authorities and to deal with difficult questions[5] presented by the assertion of such a right, when and if we are confronted with some substantial, serious, or indecent intrusion upon the private life of another.   This inoffensive book presents no such situation.

We need not answer the first two questions raised by the report.   We hold, in answer to the third question, that the book and the facts alleged or disclosed by the report show no basis for equitable relief based upon the invasion of an assumed right of privacy.   Mrs. Boyd is to be allowed costs in respect of the report to this court.

*So ordered.*

---

[4] See, for general discussion of possible protection of privacy, Restatement: Torts, § 867; Prosser, Torts (3d ed.) § 112; Harper and James, Torts, §§ 9.6–9.7; Winfield, Torts (6th ed.) § 7, p. 16; § 183; Hofstadter and Horowitz, The Right of Privacy; Prosser, Privacy, 48 Cal. L. Rev. 383; Nizer, The Right of Privacy, 39 Mich. L. Rev. 526; Bloustein, Privacy as an Aspect of Human Dignity, 39 N. Y. U. L. Rev. 962.   The citations in the briefs essentially bring up to date the extensive collection of authorities by Mr. Justice Lummus in the *Themo* case, 306 Mass. 54.

[5] Illustrations of such questions are to be found in *Sidis* v. *F-R Publishing Corp.* 113 F. 2d 806 (2d Cir.), cert. den. 311 U. S. 711; *Jenkins* v. *Dell Publishing Co. Inc.* 251 F. 2d 447 (3d Cir.) cert. den. 357 U. S. 921; *Samuel* v. *Curtis Publishing Co.* 122 F. Supp. 327 (N. D. Cal.); *Werner* v. *Times-Mirror Co.* 193 Cal. App. 2d 111; *Carlisle* v. *Fawcett Publications, Inc.* 201 Cal. App. 2d 733, 744–748.   See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 265–266, 270 et seq.   Cf. *Martin* v. *New Metropolitan Fiction, Inc.* 139 Misc. (N. Y.) 290, affd. 234 App. Div. (N. Y.) 904; *S.C.* 237 App. Div. (N. Y.) 863 (appeal after trial on the merits).