**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Anthony Joseph GARGOTTO, Defendant-Appellant.**

**No. 72–1862.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 16, 1973.

Decided April 24, 1973.

Frank E. Haddad, Jr., Louisville, Ky., for defendant-appellant.

James H. Barr, Asst. U. S. Atty., Louisville, Ky., for plaintiff-appellee; George J. Long, U. S. Atty., Louisville, Ky., on brief.

Before CELEBREZZE, KENT and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

Appellant was convicted on 13 counts of filing false wagering excise tax returns and two counts of failing to file such returns and was sentenced to five years imprisonment on each count, the sentences to run concurrently. On appeal, he contends that his conviction flowed directly from a search of the building owned by him and seizure of documents there and that such search and seizure violated rights guaranteed to him by the Fourth Amendment.

Appellant owned a three-story building in the central area of Louisville which contained a movie theatre on the first floor. According to prosecution witnesses the second and third floors were used for a handbook operation where bets were taken on horse races and other sporting events. At about 8:00 o'clock on the morning of March 22, 1969 a fire was discovered in the building of appellant, and a number of units of the Louisville Fire Department responded to an alarm. At about 8:20 a. m. the commanding officer at the fire called Lieutenant William Foushee, an arson investigator, and requested him to come to the scene because of his suspicions about the origin of the fire. Lieutenant Foushee testified that when he arrived 25 to 30 minutes after receiving the call, the fire had been extinguished but the equipment and fire fighters were still at the scene. Shortly after his arrival and after discussing the fire with the commanding officer, Lieutenant Foushee noticed that Detective John Aubrey of the Intelligence Division of the Louisville Police Department was at the scene and requested his assistance in making an investigation. Detective Aubrey testified that he had noticed the fire while on his way to work, and after checking in at his office had returned to the scene of the fire to see if his services were needed. Having been advised that the fire originated above the first floor of the building, the two men entered by a front stairway and climbed to the second floor. It was immediately obvious to them that there were numerous separate and unrelated fires, and at the top of the stairway they found very sharp burn patterns which indicated that some sort of flammable liquid had been used to set the fire. In addition to a hallway, the second floor of the building contained two rooms, and trash appeared to have been set on fire in at least one of the rooms. The third floor

apparently consisted of one large room where one or more trash fires had been set.

The two investigators noticed a number of papers scattered on the floor of both the second and third floor rooms. Some of the papers appeared to have been scattered out on the floor by the stream of water from hoses of the firemen and these were placed in a fire fighter's coat which was spread on the floor. In addition to the papers on the floor, Lieutenant Foushee directed Detective Aubrey to remove papers from cabinets which were located in the various rooms on the second and third floors. The papers from the different rooms were commingled, and those taken from the cabinets were commingled with the papers picked up from the floor. Although some of the papers were wet and a few were scorched, there was no evidence that flammable liquids or other fire accelerants had been applied to any of the papers which were collected by the investigators. Lieutenant Foushee said that he realized the papers were records of some sort but that he did not take the time to study them that day. Detective Aubrey said that he thought he recognized the papers as containing betting records, but that he did not advise Lieutenant Foushee of this. Lieutenant Foushee testified concerning the purpose of picking up the papers as follows:

> "Since we were unaware at this point as to who may have set the fire or what might be behind this setting of the fire I felt it necessary to remove any evidence that we could find, which included records."

All of the records taken from the two rooms on the second floor and the one large room on the third floor were bundled up in a single fire fighter's coat and were taken to Detective Aubrey's office at police headquarters. There apparently was never any attempt to separate the records taken from the various rooms or to keep those picked up off the floor separate from those removed from cabinets. At the time the investigation was begun the premises were secured by the fire and the police departments and no one other than officials were permitted inside the building.

Detective Aubrey described his part in the investigation as follows:

> " . . . we spoke and he asked me if I would mind going in with him and that he suspected arson in this particular case, and help him pick up some things that he wanted to seize as evidence."

He said that Lieutenant Foushee picked up various items and put them in the fire coat and pointed to other things which he wanted removed and that he, Aubrey, put those items in the coat and it was all wrapped up and brought out together. He specifically recalled that there was a desk and metal cabinet in one room and that he and Lieutenant Foushee opened drawers and took papers from the desk and cabinet. It was testified that although the appellant, Gargotto, was at the scene of the fire he was not advised that papers had been removed from the rooms on the second and third floors.

Although the two investigators agreed that the fire had been extinguished and the building secured, nevertheless Detective Aubrey said that there were a number of firemen in the building still using hoses and axes and working on hot spots in the walls. He said that he and Lieutenant Foushee worked right in the middle of the firemen. After the papers were taken to police headquarters, the two men just looked at them briefly and locked them in a room. Lieutenant Foushee testified that he was needed back at the scene of the fire and did not have time to examine the papers carefully. Detective Aubrey said that he merely confirmed that the papers contained some sort of betting records but did not examine them closely. Lieutenant Foushee testified that he never examined the papers to determine whether they might furnish evidence of a motive for the fire because someone other than

Mr. Gargotto was arrested the same day and charged with arson, and no charges were ever made against Mr. Gargotto in connection with the fire.

About a week after the fire all of the records were delivered to the office of the Commonwealth Attorney where Mr. Gargotto appeared and demanded their return. Detective Aubrey testified that although he couldn't tell by looking at the papers that any federal crime had been committed, the day after the fire he called an agent in the Intelligence Section of the Internal Revenue Service and advised him that he might be interested in looking at the records. Two agents of the Internal Revenue Service contacted Lieutenant Foushee and he gave them permission to examine the records which they proceeded to do in Detective Aubrey's office. Aubrey testified that the IRS agents brought their own copying equipment and microfilmed all of the records. This took place two days after the fire.

A timely motion was made by the appellant to suppress all evidence seized from the premises of the fire and any evidence derived therefrom. Following a hearing, the trial judge overruled the motion and also overruled objections to introduction of the evidence at the trial and the renewal of the motion to suppress made at the conclusion of the trial.

It is not questioned that Lieutenant Foushee had the duty under relevant statutes of the Commonwealth of Kentucky and ordinances of the City of Louisville to investigate the cause and circumstances of the fire for the purpose of detecting arson and related offenses. Kentucky Revised Statutes § 227.220(2)(a); 227.240. Specific authority to enter the property of appellant is conferred by KRS § 227.270(2) which provides:

> (2) The commissioner may at all reasonable hours of the day or night enter in or upon any property to make an inspection or investigation for the purpose of preventing fire loss or determining the origin of any fire, but this subsection shall apply to the interior of private, occupied dwellings only when a fire has occurred therein or when the officer has reason to believe that unsafe fire conditions exist in the building.

At the time material to this case there was no Kentucky statute describing the authority of arson investigators. However, by a law enacted in 1972 such officers were given " . . . the general powers of peace officers for the enforcement of other offenses against the Commonwealth." Regardless of state authority, when challenged on Fourth Amendment grounds the acts of the state officers must be judged by federal standards. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Elkins v. United States, 364 U.S. 206, 223, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960).

An effective investigation of the origin of the fire required a prompt inspection of the building. Admittedly neither Lieutenant Foushee nor Detective Aubrey had a search warrant. However, upon reaching the landing at the top of the stairs at the second floor of the building, the investigators found definite evidence that a fire accelerant had been used in the building. Though the fire had been extinguished, the firemen were still using water hoses and axes in the burned areas.

A warrantless search is *per se* unreasonable, and therefore prohibited by the Fourth Amendment, unless the facts of a particular case bring it within one of the specifically established exceptions to this rule. Coolidge v. New Hampshire, 403 U.S. 443, 454, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), the Supreme Court defined the "probable cause" exception to the requirement of a warrant as follows:

> "Probable cause exists where 'the facts and circumstances within their

[the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U. S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543."

We believe there was sufficient evidence of arson to establish probable cause for a further search when viewed by a "man of reasonable caution" or a "man of prudence and caution." Carroll v. United States, 267 U.S. 132, 161, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Furthermore, the fact that the fire had been so recently extinguished and the firemen were still working in the area where the records were found was an "exigency" which completed the justification for proceeding to search without a warrant. Coolidge v. New Hampshire, *supra,* 403 U.S. at 463–464, 91 S.Ct. 2022.

The rooms from which the papers of the appellant were taken were the locations of several fires involving trash and debris, although there was no indication that an accelerant had been used in any of them. In pursuing their investigations of the cause or origin of the fire, the investigators saw papers scattered on the floor in each of these rooms. These were obviously in plain view, and Lieutenant Foushee testified that often papers and records provide evidence of the purpose of a fire. These objects were subject to seizure under the circumstances because they fit the "plain view" exception to the prohibition against warrantless seizures.

In Coolidge v. New Hampshire *supra,* the requirements for a valid seizure of evidence in plain veiw without a warrant were set forth. The first requirement is that the officers' "initial intrusion" be justified. This requirement has been met in the present case, as we have held that the officers had probable cause to enter pursuant to the statute, and to search for evidence of arson under the exigencies of the situation. The second requirement is that the discovery of the evidence in plain view must be "inadvertent." Since the investigators had no prior knowledge of the location of the gambling records in appellant's building, their discovery was an inadvertent result of the lawful search for evidence of arson. It was not a "planned" warrantless search. We hold that the seizure of the documents on the floor, and otherwise in plain view, was not unreasonable within the meaning of the Fourth Amendment.

We do not believe that Colonnade Catering Corporation v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), or See v. City of Seattle, 387 U. S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), all cited by appellant, are controlling here. Those cases did not deal with administrative inspection at the time of an unusual occurrence or emergency situation such as the fire which caused the officers to conduct the search and seizure in this case. The same is true of State of Indiana v. Buxton, 238 Ind. 93, 148 N.E.2d 547 (1958), where the arson investigation was not conducted at the time of the fire and the court held that a search warrant was required.

The appellee relies on Bennett v. Commonwealth, 212 Va. 863, 188 S.E.2d 215 (Va.1972), where two distinct arson investigations were made. The first was carried out while the building was still burning and the evidence seized was a plastic jug containing a flammable fluid. It was in plain view near the rear of the house and was obviously subject to seizure under the circumstances. The second search, of the interior of the house, by an arson investigator took place the day following the fire. No search subsequent to the time of the fire is involved in the present case, and the validity of such a search is not before us.

The appellant further contends that the evidence seized consisted of private, personal papers and its introduction violated his right against self-in-

crimination guaranteed by the Fifth and Fourteenth Amendments. The records here involved are similar to those considered by this Court in United States v. Blank, 459 F.2d 383 (6th Cir. 1972). Although that case dealt with a prosecution for unlawfully conducting a gambling business rather than irregularities in filing returns, we believe that its holding controls the motion to suppress on grounds of self-incrimination in the present case. To the extent that any of the records are found to have been legally seized, they will not be subject to suppression as violative of the privilege against self-incrimination.

Appellant also argues that even if his records were legally seized by Officers Foushee and Aubrey, they had no right to deliver them to the federal agents. Lieutenant Foushee testified that he knew the records had nothing to do with the fire when he turned them over to the agents of the I.R.S. Appellant relies on United States v. Birrell, 470 F.2d 113, decided December 4, 1972 by the Second Circuit. In that case, evidence which was legally seized in a state murder investigation came to the attention of federal authorities through a news story. The federal district attorney, believing this evidence might be relevant to a pending charge against the owner of the seized property, obtained permission from the state authorities to examine it. Before the examination was made, the federal agents were advised that the owner had demanded that the property be returned to him.

The court held that under the particular facts presented in that case a motion to suppress the evidence should have been granted. The court emphasized the fact that the demand by the owner that the property be returned put the state officials on notice that a search by officers of the federal government for a different purpose could not be made without a warrant. In the present case there was no demand by appellant for return of the papers until after the federal agents had completed their examination of them. Furthermore, in this case the initiative was by the state officials who contacted the I.R.S. agents and suggested that they might be interested in the records. Thus there are factual differences between *Birrell* and the present case and these very facts were emphasized in the opinion.

Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken. Gullett v. United States, 387 F.2d 307 (8th Cir. 1967), cert. denied 390 U.S. 1044, 88 S. Ct. 1645, 20 L.Ed.2d 307 (1968).

There remains the difficult question of the proper disposition of evidence consisting of documents which were removed from drawers in the desks and cabinets. After describing the "plain view" exception, the opinion of the Court in *Coolidge* continues, at page 466, 91 S.Ct. at page 2038:

> Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges. (Citations omitted)

While it was immediately apparent to Lieutenant Foushee that the papers on the floor might supply evidence of a motive for burning the buliding, was it reasonable to extend the search to the drawers for further evidence? Or should the search have been broken off until a search warrant could be obtained? The answers to these questions depend upon an understanding of the conditions existing at the time the officers were required to make a decision. These facts were not sufficiently developed at the hearing on appellant's motion to suppress for this Court to make a determination from the record. Upon remand the District Court will hold an evidentiary hearing to determine (1) whether the exigencies of the situa-

tion were such at the time the search was extended to the drawers of the desks and cabinets to justify such search, and seizure of the contents, without a warrant; and, if no such justification is found, (2) whether the papers found in plain view can be identified and segregated from those that were removed from drawers. The results of the hearing will determine whether or not a new trial is required.

The case is remanded to the District Court for proceedings consistent herewith.