CITY OF BOSTON *vs.* ANNA F. DITSON, individually and
as trustee.

Suffolk.    October 15, 1975. — May 28, 1976.

Present: HALE, C.J., KEVILLE, & ARMSTRONG, JJ.

*Constitutional Law,* Inspection of property, Search and seizure. *Real
Property,* Inspection.    *Taxation,* Real estate tax: taking.

A notice issued by an appropriate official of a fire department pursuant
to G. L. c. 148, § 5, which ordered the defendant to remove rubbish
accumulated inside and outside her house by noon of the following
day, was constitutionally sufficient. [324-327]
Entry of fire department officials onto the defendant's premises to re-
move rubbish pursuant to the provisions of G. L. c. 148, § 5, without
the consent of the owner and in the absence of an emergency situa-
tion, constituted an illegal search and seizure. [327-329]
Although entry by officials of a fire department onto certain property
to remove rubbish pursuant to G. L. c. 148, § 5, constituted an illegal
search and seizure, the exclusionary rule did not apply to bar the
city from recovering the cost of the removal. [329-336]
A property owner, who failed to appeal an order of a building com-
missioner pursuant to St. 1938, c. 479, § 116(d), to board her house
up and repair its roof in order to make it safe after a fire and also
failed to seek timely judicial review under § 116(f) of the lien aris-
ing from the cost of the city's hiring a contractor to perform the
work, was precluded from collaterally attacking the charge in a pro-
ceeding by the city to foreclose a tax title to the property. [336-337]

PETITION filed in the Land Court on May 10, 1972.

The case was heard by *Randall, J.*

*Douglas A. Randall* for the respondent.

*Mack K. Greenberg,* Assistant Corporation Counsel
(*Herbert P. Gleason,* Corporation Counsel, & *Robert A.
Coviello,* Assistant Corporation Counsel, with him) for the
city of Boston.

HALE, C.J.    This is an appeal by the respondent from
a decree of the Land Court upon the city's petition to
foreclose a tax title to a parcel of land in Boston (the
locus). The locus was taken by the city for nonpayment

of the 1969 real estate taxes assessed thereon, together
with sewer and water charges and interest, under G. L.
c. 60, § 54, by an instrument of taking recorded on May 7,
1970. The petition to foreclose was brought on May 10,
1972. Five days later the respondent paid all but $1 of the
1969 bill.

At the time of the respondent's payment, the real estate
tax assessed on the locus for 1970 had been added to the
account. Between that time and the entry of the decree
appealed from, real estate taxes for 1971 and 1972 were
added. The taxes for those three years, totalling $9,915.48,
are not at issue.[1] Rather, the respondent's attack is con-
fined to two items of expense incurred by the city in con-
nection with the locus and added to the respondent's tax
title account: a charge of $11,927.15 for the removal of
rubbish from the locus in 1969, and a charge of $7,880 for
repairing and boarding up the house on the locus after it
had been damaged by fire in 1971.

### THE RUBBISH REMOVAL CHARGE

The facts relating to the rubbish removal charge, in so
far as material to our disposition of this case, were found
by the judge to be substantially as follows. From 1962 to
1969 the city's fire department received many complaints
about accumulations of rubbish inside and outside the
house, but repeated requests by the department for its
removal and for permission to inspect the house proved
unavailing. Early in the morning of July 24, 1969, an
abatement order issued by an appropriate official of the
fire department pursuant to G. L. c. 148, § 5 (as amended
through St. 1962, c. 456),[2] was served upon the respondent

---

[1] A contention by the respondent in the Land Court that the 1969 tax
was improperly assessed is not argued in her brief on appeal, and we
therefore do not consider it.

[2] "The marshal, the head of the fire department or any person to
whom the marshal or the head of the fire department may delegate his
authority in writing, may, and upon complaint of a person having an
interest in any building or premises or property adjacent thereto, shall,
at any reasonable hour, enter into buildings and upon premises, which

in hand. The order directed her to remove the rubbish by noon of the following day. After the deadline had passed, members of the fire department, having determined that no change had been effected in the property, broke into the house at about 3:15 P.M. on July 25, 1969. So far as appears on the present record, they did so purely on the strength of the abatement order and the provisions of G. L. c. 148, § 5, and not pursuant to a search warrant. They discovered "an enormous accumulation of rubbish" inside and outside the house, and, after attempting to preserve anything of value, had the premises cleared of combustible material by an independent contractor engaged by the department. The respondent was not allowed on the locus while the clearing operations were taking place except when accompanied by a member of the department. The contractor charged $11,927.15, and that amount was duly entered on the tax title account on May 8, 1970.

The judge found and ruled that the city had complied with G. L. c. 148, § 5 (see fn. 2), in all respects. The

---

term for the purposes of the remainder of this section shall include alleys adjacent thereto, within their jurisdiction and make an investigation as to the existence of conditions likely to cause fire. They shall, in writing, order such conditions to be remedied, and whenever such officers or persons find in any building or upon any premises any accumulation of combustible rubbish, including waste paper, rags, cardboard, string, packing material, sawdust, shavings, sticks, waste leather or rubber, broken boxes or barrels or other refuse that is or may become dangerous as a fire menace or as an obstacle to easy ingress into or egress from such buildings or premises, they shall, in writing, order the same to be removed or such conditions to be remedied. Notice of such order shall be served upon the owner, occupant or his authorized agent by a member of the fire or police department. If said order is not complied with within twenty-four hours, the person making such order, or any person designated by him, may enter into such building or upon such premises and remove such rubbish or abate such condition at the expense of such owner or occupant. Any expense so incurred by or on behalf of the commonwealth or of any city or town, shall be a lien upon such building or premises, effective upon the filing in the proper registry of deeds of a claim thereof signed by such person and setting forth the amount for which the lien is claimed; and the lien shall be enforced within the time and in the manner provided for the collection of taxes upon real estate. Any such owner or occupant who fails or refuses to comply with said order shall be punished by a fine of not more than fifty dollars for each consecutive forty-eight hours during which such failure or refusal to comply continues."

respondent does not question that determination or the amount of the charge made by the contractor. She contends, however, that the procedure followed by the fire department, though sanctioned by the terms of § 5, deprived her of rights guaranteed by the Constitution of the United States, and that the lien arising from that charge was therefore invalid. Specifically, she contends that the notice contained in the abatement order was so insufficient as to result in a deprivation of her property without due process of law in violation of the Fourteenth Amendment, and that the warrantless entry into her house and subsequent activities there by the fire department constituted an unreasonable search and seizure within the meaning of the Fourth Amendment, as made applicable to State action by the Fourteenth Amendment.

We are not persuaded that the notice served on the respondent was constitutionally insufficient in any of the three respects argued in her brief. One such argument is that she was incompetent and that notice requirements in the case of an incompetent person are more stringent than in other cases. While that argument is correct or supportable as an abstract proposition of constitutional law (*Covey* v. *Somers*, 351 U. S. 141, 145-147 [1956]; *Robinson* v. *Hanrahan*, 409 U. S. 38, 40 [1972]), it has no application here. Although the respondent was obviously eccentric, there was no showing that she was incompetent at the time she received the notice. Compare *Nelson* v. *New York City*, 352 U. S. 103, 108-109 (1956). Nor can we agree that the notice was constitutionally defective in giving her so short a period of time to abate the condition. She had had ample warning before the order was served that the condition could not be permitted to continue, and in any event a person "owning a building in such shape had reasonable ground to expect that public authorities soon might require its prompt rehabilitation. . . ." *DiMaggio* v. *Mystic Bldg. Wrecking Co. Inc.* 340 Mass. 686, 693 (1960). The respondent's argument that she was not given adequate warning of the high cost of the rubbish removal or of the likelihood of the loss of her home by reason

thereof fails because there is no showing on this record that the amount of the charge, uncontested at the time it was assessed, was not commensurate with the quantity of rubbish on the premises and the work involved in removing it. Nor is there a showing that the authorities anticipated or had reason to anticipate at the time that the respondent would ultimately lose her home. For all that appears, the possibility of such an outcome became a probability only when the respondent failed to pay the charge many months later.

The entry into the respondent's apartment by the fire department officials without a search warrant raises issues of (1) the constitutionality of that procedure and (2) the effect of that entry on the enforceability of the item in the tax account arising from the cleanup of the rubbish.

The Supreme Court of the United States has made clear that an administrative inspector may enter private premises without consent only after obtaining a search warrant. *Camara* v. *Municipal Court,* 387 U. S. 523, 534 (1967). The court has recently "adhered" to *Camara* and its companion case, *See* v. *Seattle,* 387 U. S. 541 (1967). *Air Pollution Variance Bd. of Colorado* v. *Western Alfalfa Corp.* 416 U. S. 861, 864 (1974). In *Camara* a housing inspector sought to enter the appellant's premises under the authority of a municipal ordinance that stated, "Authorized employees of the City departments or City agencies, so far as may be necessary for the performance of their duties, shall, upon presentation of proper credentials, have the right to enter, at reasonable times, any building, structure, or premises in the city to perform any duty imposed upon them by the Municipal Code." *Camara, supra,* at 526. The court overruled *Frank* v. *Maryland,* 359 U. S. 360 (1959), and held that the appellant was entitled to a writ of prohibition against criminal prosecution for refusal to allow entry of the municipal inspector without a search warrant. It follows that pre-*Camara* cases applying the principle of *Frank* v. *Maryland* to uphold convictions based on warrantless administrative searches can no longer be treated as accurate statements of the law in this area.

See e.g., *Commonwealth* v. *Hadley*, 351 Mass. 439 (1966), vacated and remanded 388 U. S. 464 (1967); *Commonwealth* v. *Dixon*, 352 Mass. 420, 423 (1967).

The present case does not fit within any exception to the warrant requirement for administrative searches. In *Camara* itself the court listed a number of "emergency situations" under which prompt inspections without a warrant would not constitute an unreasonable search in violation of the Fourth Amendment. 387 U. S. at 539. The listed examples included seizure of unwholesome food, compulsory smallpox vaccination, and summary destruction of tubercular cattle. *Ibid.* The court also indicated that warrants need not be obtained unless the property owner refused to give consent for the search. *Ibid.*[3]

The record in the present case will not support either a finding of consent or of the type of emergency situation suggested by the court in *Camara.* The fire department had received complaints about accumulations of rubbish on the respondent's property for seven years before undertaking the cleanup in 1969. The abatement order itself, following the requirements of G. L. c. 148, § 5, allowed twenty-four hours before the fire department could enter to clean up the premises. That waiting period belies any claim of exigency.[4]

The city's reliance on the exception to the warrant requirement for inspections of closely regulated businesses set out in *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970), and in *United States* v. *Biswell*, 406 U. S.

---

[3] Although the question of the availability of a warrant, if one had been sought, has not been raised in the present case, we note that a court may issue a warrant for an administrative search on a lesser showing of probable cause than in criminal cases. See *Camara,* 387 U. S. at 538-539.

[4] The lack of exigency distinguishes the present case from those in which warrantless entries were upheld in searches of premises during a fire or shortly thereafter to determine its cause. See *United States* v. *Green,* 474 F. 2d 1385, 1388-1389 (5th Cir. 1973), cert. den. 414 U. S. 829 (1973); *United States* v. *Gargotto,* 476 F. 2d 1009, 1010-1013 (6th Cir. 1973); *Steigler* v. *Anderson,* 496 F. 2d 793, 796-797 (3d Cir. 1974), cert. den. 419 U. S. 1002 (1974).

311 (1972), does not bear on the search of and seizure from a private home in the present case.[5]

We hold that the entry onto the premises and inspection thereof constituted an illegal search. We must now consider the effect of this violation of constitutional rights under the Fourth Amendment on the item in the tax title account representing reimbursement to the city for its expenses in the cleanup of the accumulated rubbish on the respondent's property. We look first to the statutes governing the collection of such charges. General Laws c. 148, § 5, provides that such charges shall become a lien on the property "and the lien shall be enforced within the time and in the manner provided for the collection of taxes upon real estate." Compare *Worcester* v. *Hoffman,* 345 Mass. 647, 648 (1963).[6]

---

[5] In *Colonnade* the court suggested, and in *Biswell* it confirmed, that Congress could allow warrantless inspections of closely regulated industries. In *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973), the court described *Colonnade* and *Biswell* in a manner that strongly suggests their inapplicability to an inspection of a private home, by stating, "A central difference between those cases and this one is that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Id.* at 271. Lower courts have further limited the *Colonnade-Biswell* exception to the warrant requirement for administrative searches by construing the inspections of business premises under the Occupational Safety and Health Act (OSHA), 29 U. S. C. 657(a) (1970) to require warrants. A very recent three-judge court decision, *Brennan* v. *Gibson's Products, Inc.* 407 F. Supp. 154, 157-163 (D. Tex. 1976), limited the *Colonnade* and *Biswell* exceptions to the warrant requirement to businesses more closely regulated than those within the almost universal reach of OSHA. Contrast *Brennan* v. *Buckeye Industries,* 374 F. Supp. 1350 (S.D. Ga. 1974).

[6] General Laws c. 60, § 37, states, in part, "No . . . item included in a tax title account shall be held to be invalid by reason of any error or irregularity which is neither substantial nor misleading, whether such error or irregularity occurs . . . in the proceedings of any other official or officials charged with duties in connection with . . . the inclusion of such item in the tax title account." We do not regard it as having any applicability to these errors. See generally *Fall River* v. *Conanicut Mills,* 294 Mass. 98, 99-100 (1936); *Bartevian* v. *Cullen,* 369 Mass. 819, 822-823 (1976). The purpose of § 37 was to mitigate the severity of cases holding that the tax laws must be observed to the most minute particular before a tax lien could be enforced. *Fall River, supra,* at 99.

The nature of the relief sought by the respondent must be distinguished from the remedies usually applied for violations of Fourth Amendment rights. The respondent does not argue that the warrantless entry was the source of evidence necessary to prove her obligation to the city which should have been suppressed by the application of an exclusionary rule but rather that the item in the tax title account arose from procedures that included the warrantless entry. The parties have not directed our attention to, and we have not found, any cases that determine the validity of a charge and lien therefor arising out of conduct that has been held to be in violation of rights protected by the Fourth Amendment which do not rely on an evidentiary exclusionary rule.[7]

The respondent might have brought an action against the fire department officials for compensatory damages resulting from the unlawful search and seizure.[8] The respon-

---

As the constitutional violations here cannot be classified as insubstantial, we must determine whether they require the remedy of voiding this item in the tax title account.

[7] For cases which have considered the effect of Fourth Amendment violations on tax liens see fn. 10, *infra.*

We also distinguish the remedy afforded by *Camara.* The court in *Camara* concluded, "that appellant had a constitutional right to insist that the inspectors obtain a warrant to search and that appellant may not constitutionally be convicted for refusing to consent to the inspection." 387 U. S. at 540.

We do not view this holding as necessarily requiring the remedy the appellant seeks. We view the *Camara* remedy as limited to a prohibition against criminal prosecution for the assertion of constitutional rights. The liability in the present case, unlike *Camara,* is compensatory only, and is not in any way a criminal penalty.

[8] In the Federal courts, such an action against State officials for invasion of privacy by an unlawful search and seizure may be brought pursuant to 42 U.S.C. § 1983 (1970). Compare *Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U. S. 388 (1971). Prior to the passage of G. L. c. 214, § 1B, inserted by St. 1974, c. 193, § 1, the availability of compensatory damages for tortious invasion of privacy had not been established in Massachusetts, although the Supreme Judicial Court had indicated its willingness to consider such a possibility, "when and if we are confronted with some substantial, serious or indecent intrusion upon the private life of another." *Frick* v. *Boyd,* 350 Mass. 259, 264 (1966). See *Commonwealth* v. *Wiseman,* 356 Mass. 251, 258 (1969).

dent, thus, seeks a remedy additional to such a cause of action. Recent Supreme Court decisions have similarly characterized the exclusionary rule in criminal cases as a court-imposed remedy to control violations of Fourth Amendment rights by State officials. In this light we can examine cases that define the outer limits of the exclusionary rule. From these we derive a balancing test to use in determining whether the Fourth Amendment requires the remedy that the defendant seeks.

A full discussion of the remedial character of the exclusionary rule was provided by Mr. Justice Powell in *United States* v. *Calandra,* 414 U. S. 338 (1974). In that case, a witness before a grand jury sought to avoid responding to certain questions on the ground that they were based on information acquired by the government in the course of an illegal search and seizure. The court held that the exclusionary rule preventing the use of such evidence in a prosecution of someone who had standing to object to the search did not prevent such grand jury questioning. Mr. Justice Powell, writing for the majority, said, "The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim . . . Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures . . . In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." 414 U. S. at 347-348. Mr. Justice Powell proceeded to define a balancing test for use in determining whether the exclusionary rule should apply to the use of evidence other than in the prosecution of the case-in-chief against the victim of the search and seizure. Following the analogy set out above, we believe that balancing test should be used to determine whether a remedy other than a cause of action for the invasion of privacy must be afforded to the respondent here.

Mr. Justice Powell offered the standing requirement of *Brown* v. *United States,* 411 U. S. 223 (1973), and *Alder-*

*man* v. *United States,* 394 U. S. 165 (1969), as an example of the balancing process. 414 U. S. at 338. He wrote, "Thus, standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search. [Citations omitted.] This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search." *Ibid.*

Thus, in determining whether to apply the exclusionary rule in grand jury proceedings, Mr. Justice Powell weighed the damage that would be done to the historic investigative role of the grand jury by the introduction of disruptive litigation of exclusionary rule challenges, against the potential benefits of further deterrence of illegal police conduct. In light of the availability of the exclusionary rule in the case-in-chief, the court "decline[d] to embrace a view that would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury," *id.* at 351-352, and to extend the exclusionary rule to grand jury questioning.

Of the cases that have employed the balancing test described in *Calandra,* the one we find most helpful preceded *Calandra* but correctly foresaw the analysis the court adopted. Although the suppression of evidence was at issue in the Oregon Supreme Court's opinion in *State Forester* v. *Umpqua River Navigation Co.* 258 Ore. 10, cert. den. 404 U. S. 826 (1971), we examine it for its holding that no remedy other than a cause of action for invasion of privacy was required by the alleged Fourth Amendment violations. The factual similarities to the present case make this holding especially relevant to the determination of the need for an additional remedy here.

The State forester brought a civil action to collect for costs incurred in fighting a forest fire it claimed resulted from sparks thrown off by Umpqua's earthmoving equip-

ment. Umpqua argued that a nonconsensual inspection of some of its machinery constituted an unreasonable search and seizure. While the court expressed its doubts that the inspection of machinery left out in a field represented an illegal search and seizure ("if an enclave of privacy is what is protected by the Fourth Amendment, we have doubt whether any enclave of privacy was penetrated in this case," 258 Ore. at 14), it held that even assuming the search and seizure were illegal, no exclusionary rule need be applied.

In its review of prior cases, the Oregon Court correctly foresaw *Calandra* by emphasizing the principle of deterrence as a justification for the exclusionary rule announced for State criminal cases in *Mapp* v. *Ohio,* 367 U. S. 643 (1961). The court then examined the type of investigation in the case at hand. It described it as not an investigation aimed at suspected criminal conduct, but only as an attempt to determine the cause of a fire. It noted that there was no known pattern of illegal searches and seizures in such fire investigations, whereas in *Mapp,* 367 U. S. at 656, the court referred to the need to deter illegal searches and seizures in criminal investigations. The court pointed to the potential civil liability for invasion of privacy of State officials who engaged in illegal searches and seizures. It suggested that victims of illegal searches and seizures conducted in conjunction with civil investigations would find it far easier to establish civil liability than would criminals seeking similar relief for wrongs suffered during criminal investigations. The court also suggested that the victims of such civil searches and seizures might be able to complain more effectively to administrative officials who could bring the offending officials into line. 258 Ore. at 23-26. The court concluded, "[W]e do not find that illegal searches and seizures outside the area of law enforcement officers investigating crimes occur frequently. In addition, we have not been shown, if such were the practice, that remedies other than exclusion of evidence would be inadequate to deter the continuance of such practice. On the other side of the ledger, we continue to regard a trial as a

search for the truth and, therefore, competent evidence should never be excluded except for the most compelling reason." *Id.* at 26.[9]

Although a number of cases consider the effect of Fourth Amendment violations on tax liens, we find them of less assistance than *State Forester* because of their reliance on the exclusionary rule without reference to the *Calandra* balancing test.[10]

---

[9] Examples of other cases applying the *Calandra* test include *Honeycutt* v. *Aetna Ins. Co.* 510 F. 2d 340 (7th Cir.), cert. den. 421 U. S. 1011 (1975), and *United States* v. *Rushlow,* 385 F. Supp. 795 (S.D. Cal. 1974). In *Honeycutt,* the defendant insurance company introduced evidence obtained by a fire marshal in a warrantless search in a civil action on a fire insurance policy. The court agreed that the warrantless inspection was within the proscription of *Camara* and thus unconstitutional but held that the exclusionary rule need not be applied. The court concluded, "Holding that the exclusionary rule is inapplicable to grand jury proceedings where, of course, the government is a party seems to establish a fortiori its inapplicability to civil actions between private parties, and especially so when, after the most thorough consideration, every reason asserted for the applicability of the rule to civil actions is held to be insufficient." *Id.* at 348.

Similarly, it was held in *Rushlow,* adhering to the balancing test of *Calandra,* that the exclusionary rule is not available in probation revocation hearings. The court suggested that such an extension of the exclusionary rule would severely impede probation revocation hearings and, again, that little additional deterrent would be afforded, since evidence illegally seized could be suppressed in a subsequent criminal trial for the conduct which was the subject of the probation revocation hearing. *Id.* at 797. We cite *Rushlow* solely for its application of the balancing test and not for its result.

[10] See, e.g., *Pizzarello* v. *United States,* 408 F. 2d 579 (2d Cir. 1969); *United States* v. *Janis,* 31 Am. Fed. Tax R. 2d 73-1049 (1973) aff'd mem. No. 73-2226 (9th Cir. July 22, 1974), cert. granted 421 U. S. 1010 (1975) (tax liens voided where based substantially on evidence obtained in illegal search and seizure). Contrast, *Welsh* v. *United States,* 220 F. 2d 200 (D.C. Cir. 1955); *Field* v. *United States,* 263 F. 2d 758 (5th Cir.), cert. den. 360 U. S. 918 (1959); *Yannicelli* v. *Nash,* 354 F. Supp. 143 (D. N. J. 1973); *White* v. *United States,* 363 F. Supp. 31 (N.D. Ill. 1973).

The Tax Court has stated that evidence obtained in an illegal search and seizure is inadmissible in civil tax cases. *Elfrain T. Suarez,* 58 T.C. 792, 806 (1972) (income tax liability of doctor subject to warrantless search on suspicion of performing abortions).

The *Calandra* balancing test, not considered in the above-cited cases, or in the District Court opinion in *Janis,* has been raised by the government in its brief before the Supreme Court in *Janis.* The government suggests, "the inapplicability of the deterrence theory is especially

We must then evaluate the benefit and harm that would be created by allowing the remedy of barring the city from recovering the cleanup costs. The principal benefit is the potential deterrent effect of such a remedy. We find the Oregon Supreme Court's observations in *State Forester* persuasive here. Our attention has not been directed to any pattern of illegal entries by fire officials in the exercise of their duties under G. L. c. 148, § 5. We have every reason to believe that the effect of our holding, that a nonconsensual search pursuant to that section in other than exigent circumstances requires a search warrant, will be that fire officials will in the future procure such warrants. As the Oregon Supreme Court suggested, civil plaintiffs not accused of a crime may be able to pursue such remedies with greater likelihood of success than those accused or convicted of crimes, and the potential of such suits may have some deterrent effect on potential violations of Fourth Amendment rights. We note, however, that in the present case no alternative remedy to the cause of action for invasion of privacy is available for deterrent effect. In this way, the case differs from *Calandra* and *Rushlow*, where a potential alternative was the exclusion of the illegally-seized evidence in the main criminal proceedings and that was considered to carry out a sufficient deterrent function.

On the other side of the balance, we must consider the harm to the city that would result from the voiding of this item in the tax title account. Requiring the city to bear the $11,927.15 cleanup cost without any compensating rights to equity in the building that is subject to the lien for that charge would result in a windfall to the respondent. The respondent had a statutory obligation to maintain her premises free of fire hazards or bear the cost of cleaning them up.

Compared with the harm which would result to the city,

evident here, since it is wholly unrealistic to assume that local police officers would be deterred from illegal searches and seizures because a possible federal civil tax liability might be rendered uncollectable." Brief at 10-11.

we find that the benefits of granting the requested relief are minimal as it appears that city officials are unlikely to engage in such illegal conduct in the future and civil actions for damages are available to deter that conduct. Thus, we hold that the Fourth Amendment does not require voiding this item.

### THE CHARGE FOR REPAIRING AND BOARDING UP THE HOUSE

With regard to the charge for repairing and boarding up the house on the locus after it had been largely destroyed by fire, the judge made findings to the following effect. After the premises had been cleaned in 1969, as described in the previous section of this opinion, the respondent appears to have lived in a car at the rear of the house and continued to use the house for such purposes as keeping a varying number of dogs. After the fire, which occurred in June, 1971, she was ordered by the city's building commissioner pursuant to St. 1938, c. 479, § 116 (d),[11] to board the house up and repair its roof in order to make it safe. She apparently did nothing in response to that order, and the building commissioner engaged a contractor to perform the necessary work on an emergency basis for $7,880. The work was completed on March 8, 1972, and she was billed for the cost thereof on April 14 of that year in accordance with St. 1938, c. 479, § 116 (e), whereunder such expenses constitute a debt to the city and a lien upon the premises.

---

[11] "Every building ... which is dangerous or unsafe shall be made safe or removed; or every such building shall be vacated forthwith on order of the commissioner, with the approval of the mayor. Such order shall be in writing and shall be addressed and delivered, or mailed, postage prepaid, to the owner or tenant, if he is known and can be found, or otherwise by posting an attested copy of the order in a conspicuous place upon an external wall of the building, and shall state the conditions under which the building may again be used or occupied ... If in the opinion of the commissioner the public safety so requires the commissioner, with the approval of the mayor, may at once enter the building or other structure which he finds unsafe or dangerous, or land on which it stands ... with such assistance as he may require, and make safe or remove said unsafe or dangerous building or other structure...."

The judge noted that the respondent had a right to appeal the order of the building commissioner to a statutory board of appeal under St. 1938, c. 479, § 118(a), and a right to judicial review of any decision by the board under § 119(f) of the same chapter, but that she did not avail herself of these remedies. He also pointed out that she failed to seek timely judicial review of the lien arising from this charge, as was her right under St. 1938, c. 479, § 116(f).[12] The judge ruled that the appellant's failure to pursue those statutory remedies precluded her collateral attack on this charge in the present foreclosure proceeding.

The ruling was correct. Compare *DiMaggio* v. *Mystic Bldg. Wrecking Co. Inc.* 340 Mass. at 692. The respondent's contention to the contrary is based entirely on the assertion that the city, rather than she, was in possession and control of the locus at the time, and therefore had no right to impose the charge upon her. Apart from being based on a highly questionable view of the facts, the contention cannot (and does not purport to) account for or excuse her failure to litigate the matter at the proper time and in the proper forum. The charge must therefore stand.

*Decree affirmed.*

---

[12] "The owner of the real estate to which a lien has attached, as provided in paragraph (e) within ninety days after the statement of said lien was filed in the registry of deeds or with said assistant recorder, as the case may be, may appeal to the municipal court of the city of Boston, which shall hear and determine after a hearing whether the amount of the claim is more than the amount actually expended to make safe or remove the building or structure, if amount is more, said court may reduce the amount of the claim to the amount so actually expended."