In re John Michael STACY, III, Debtor.

Appeal of Robert MAGNACCA, Richard Duncan and Thomas Parnell.

Bankruptcy No. 87–40623–JFQ.

Civ. A. No. 88–0199–F.

United States District Court, D. Massachusetts.

April 24, 1989.

Joseph A. Frank, West Springfield, Mass., and Michael Hassett, Keyes & Donnellan, Springfield, Mass., for appellants.

Harold B. Murphy, Hanify & King, Boston, Mass., and Maurice Cahillane, Egan, Flanagan & Egan, Springfield, Mass., for trustee and ComFed.

Mark Beglane, Bacon, Wilson, Ratner, Cohen, Salvage, Fitzgerald & Fialky, Springfield, Mass., for appellee, Lachowetz.

MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

## I. INTRODUCTION AND BACKGROUND

As the facts of this case are labyrinthine, the Court will attempt to lay them out in

some detail, as much for its own benefit as for the parties'.

### A. The Debtor's Assets

On November 17, 1987, the debtor, John Michael Stacy, III ("Stacy"), filed a Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code. Included in Stacy's assets at the time was part ownership in a parcel of property ("Parcel 1") and an option to buy a second parcel ("Parcel 2"). The two abutting parcels are known as 43–47 Cross Street, and are located in Chicopee, Massachusetts ("Chicopee"). The other ownership interest in Parcel 1 is held by Stephen Alban ("Alban"). ComFed Bank ("ComFed") holds a first mortgage on the first parcel and Tri-State Builders ("Tri-State"), owned by Anthony Lachowetz ("Lachowetz"), holds a second mortgage. Parcel 2, abutting the first, is owned by Lachowetz and is included in Stacy's proposed sale to Robert Magnacca, Richard Duncan and Thomas Parnell, the buyers and appellants in this action.

### B. The Purchase and Sale Agreement

At a non-evidentiary hearing held at the Bankruptcy court on April 19, 1988, Lachowetz explained that the option held by Stacy to purchase Parcel 2 required completion of the construction of Cross Street and the construction of utilities before it may be exercised. The various parties then left the courtroom and returned shortly with a purchase and sale agreement, which was read into the record.

The major provisions were as follows: (1) Stacy, Alban and Lachowetz agreed to sell the two parcels to the appellants for $1,095,000, with $900,000 allocated to Parcel 1 and $195,000 to Parcel 2. (2) The sale of Parcel 1 was contingent upon approval by Chicopee for construction of seventeen condominium units. (3) The appellants' obligation to purchase was contingent upon their obtaining a mortgage for 80% of the purchase price. However, the contingency provision was limited to ten days; failure to exercise the contingency within that period would bind the appellants to the agreement. (4) The appellants were given the right to deed back Parcel 2 to Lachowetz if they were unable to obtain approval from Chicopee for construction of a 39–unit building on Parcel 2. (5) A unit in the building on Parcel 1, occupied by Lachowetz's son under a 99–year lease, was to be conveyed to him for one dollar. At the request of the Bankruptcy Court, all parties agreed to waive the Statute of Frauds.

### C. The Alleged Breach

On April 29, 1988, the tenth day following the agreement, Chicopee Co-operative Bank ("Bank") gave the buyers a commitment to grant them a loan of $1,150,000, secured by a mortgage on both parcels. The amount of the loan would enable the buyers to purchase the property and complete the seventeen units located on Parcel 1. As a result of this commitment letter, the buyers did not exercise their right to withdraw under the financing contingency as set forth in condition (3), *supra*.

In a letter dated May 24, 1988 the buyers' attorney, Joseph A. Frank, Esq., informed the Bank that two potential title defects might affect the Bank's mortgage. First, a portion of Parcel 2 was taken by Chicopee in 1929 for failure to pay taxes. He suggested that the taking was suspect because Chicopee failed to give the owner statutorily prescribed notice of the taking.[1] Frank also stated that a second potential defect was the existence of the 99–year lease held by Lachowetz's son.

One week later, the Bank informed the buyers that it required "clear and marketable title," and declared that the title as it stood was unacceptable. The buyers then informed Stacy and Lachowetz that they were withdrawing from the agreement because of an inability to obtain clear title.

Following the buyers' failure to close the purchase and sale agreement on the agreed date, May 19, 1988, the trustee in bankrupt-

---

**1.** It is alleged by the buyers that title examiners in Hampden County refuse to certify such titles in light of *Mennonite Board of Missions v.* *Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), in which the Supreme Court struck down a similar Indiana statute.

cy, Stephen A. Darr ("Darr"), ComFed, Lachowetz and Tri–State filed a Joint Motion to Compel Performance of the Purchase and Sale Agreement ("Joint Motion"). The buyers filed an objection to the motion on July 1, 1988. Bankruptcy Judge Queenan held an evidentiary hearing on July 13, 1988 and, a week later, issued findings of fact and law, a portion of which is reproduced herein:

12. The Buyers' real motive in seeking to avoid performance has nothing to do with the asserted title problems.

13. The normal title search in Hampden County extends back 50 years, or such additional period as is necessary to start with a warranty deed. Here that practice would extend the search back to the mid–1920's.

14. A title insurance policy could be purchased to cover the asserted title defect here, and would have been purchased by the Buyers in normal course. The asserted defect from the tax taking could also have been easily removed in a Land Court proceeding.

The court makes the following rulings of law:

1. The existence of a 99 year lease held by Lachowetz's son on one of the condominium units on Parcel 1 does not give the Buyers the right to assert rights under the provision of the agreement assuring them of "good, record and marketable title" for two reasons. First, they were already aware of the lease. Second, the lease would be terminated upon performance of the provision requiring conveyance of the unit to Lachowetz's son for one dollar.

2. Nor do the Buyers have the right to complain about the 1929 tax taking. The taking was not a defect in the first instance because notice was given to the owner of record as of the original assessment date. But even if the notice was improper and thus sufficient to otherwise prevent "good, record and marketable title," the defect has been cured by Mass.

Gen.L. ch. 60, § 80C. This is exactly the type of problem the statute is designed to solve.

3. Even if the 1929 tax taking creates a defect of title which is not cured by Mass.Gen.L. ch. 60, § 80C, that defect does not prevent the Buyers obtaining "good, record and marketable title." The defect, if uncured by the statute, is *de minimis* in view of the fact that: (1) title insurance adequately covering it could have been purchased and in fact would have been purchased by the Buyers; and (2) the asserted defect could have easily been removed in a Land Court proceeding.

4. The parties are entitled to specific performance of the Buyers. *See Olszewski v. Sardynski*, 316 Mass. 715, 56 N.E. 2d 607 (1944).

*In re John Michael Stacy, III*, No. 87–40623–JFQ, slip op. at 5–6 (Bankr.D.Mass. July 20, 1988). On the same day, Judge Queenan issued a judgment ordering the buyers to pay the Trustee $875,000 plus interest and costs in return for a warranty deed of Parcel 1.[2] The buyers were also ordered to pay Lachowetz $195,000 plus interest and cost in return for a warranty deed to Parcel 2. On July 29, 1988, the buyers asked Judge Queenan to reconsider his decision, arguing that the July 13 hearing should have been adversarial, and that Judge Queenan made errors of both fact and law. In a handwritten note attached to the motion on August 9, 1988, Judge Queenan denied the motion without a hearing.

On the following day, the buyers filed a notice of appeal of the Bankruptcy Judge's opinion in this Court. On August 22, 1988, the buyers also filed a motion for a stay of the Bankruptcy Court's judgment pending appeal. This Court refused to issue a stay on September 2, 1988, noting that the buyers had failed to produce any evidence that they had complied with Bankruptcy Rule 8005, which requires that such motions be considered by the Bankruptcy Court first.

---

2. A deposit of $25,000 was given by the buyers at the time the purchase and sale agreement was drawn up.

In a handwritten note dated September 13, 1988, Judge Queenan denied the buyers' motion for a stay "for failure to post adequate supersedeas bond and to establish likelihood of success on appeal." Later that month, on September 28, 1988, ComFed requested and the Bankruptcy Court issued an *ex parte* Amended Execution against the buyers in the amount of $875,000. Following the issue of the execution, a real estate attachment was levied against the property of the buyers. The buyers renewed their motion for a stay before the Bankruptcy Judge on October 5, who found no reason to alter his decision.

The buyers then returned to this Court on October 18, 1988 and resurrected their request for a stay. In an opinion dated November 10, 1988, this Court noted that the Trustee in bankruptcy had not opposed the buyers' request for a stay, and accordingly granted the stay of judgment pending appeal.

The next salvo in this multi-faceted battle was also fired by the buyers, who asked this Court on November 18, 1988, to recall the amended execution and to discharge the real estate attachment against their property. Three days later, the Trustee and ComFed requested permission to file opposition late against the buyers' request for a stay. This Court granted the request. The Trustee and ComFed also asked this Court to vacate the stay pending appeal. The Court has not ruled on that motion to date. On November 23, 1988, the Trustee and ComFed also filed an opposition to the buyers' motion to recall the execution and attachment.

On December 5, 1988, this Court received the buyers' brief in support of their appeal from Judge Queenan's decision, which was responded to by the Trustee and ComFed on January 30, 1989. Lachowetz and Tri-State Builders also filed a memorandum in support of the Bankruptcy Judge's decision.

To summarize, the following situation obtains:

(1) Still in force is an amended execution in the amount of $875,000 issued by the Bankruptcy Court against the buyers, as well as a real estate attachment and levy against their property.

(2) Also in force is this Court's stay of the Bankruptcy Court's judgment pending appeal.

(3) Pending before this Court are the following matters:

(a) Trustee and ComFed's opposition to the stay;

(b) Trustee and ComFed's motion to vacate the stay;

(c) Buyers' motion to recall the amended execution and attachment, and Trustee and ComFed's opposition thereto;

(d) Buyers' appeal of the Bankruptcy Court's judgment, and assorted opposition thereto.

In the interests of judicial economy, the Court moves directly to the buyers' appeal of the Bankruptcy Court's July 20, 1988 judgment. Resolution of the appeal will of necessity resolve the controversy surrounding both this Court's stay and the Bankruptcy Court's execution.

## II. DISCUSSION

### A. The Bankruptcy Court's Subject Matter Jurisdiction

#### 1. Arguments of the Parties

The initial challenge raised by the buyers is that the Bankruptcy Court's hearing of July 13, 1988 violated the procedural requirements of the Bankruptcy Rules. Specifically, the buyers argue that the request for specific performance of the sale of property was in fact a request for equitable relief, and that prior to ordering that the sale of the property take place, the Bankruptcy Court should have held an adversary hearing as set forth in Bankruptcy Rule 7001(7) ("An adversary proceeding is governed by the rules of this Part VII. It is a proceeding ... (7) to obtain an injunction or other equitable relief...."). Rule 3 of the Federal Rules of Civil Procedure, incorporated into bankruptcy proceedings by Bankruptcy Rule 7003, requires that adversary proceedings be commenced with the filing of a complaint in the court in which the case is pending. Since the July

13 hearing was initiated through motion instead of a complaint, the buyers contend that Lachowetz and ComFed failed to properly invoke the jurisdiction of the Bankruptcy Court. Appellants' Brief at 9.

In reviewing the arguments against the buyers, the Court has the benefit of two appellee briefs, one filed by Lachowetz and Tri–State Builders ("Lachowetz Brief") and the other filed by the Trustee and ComFed Savings ("Trustee Brief"). Lachowetz argues that the underlying proceeding was in fact a motion for contempt, and as such is a "contested matter" governed by Bankruptcy Rule 9014 ("In a contested matter in a case under the Code not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought."). Lachowetz Brief at 6. Lachowetz goes on to assert that due process is met by ·either Rule 7003 or 9014. *Id.* at 6–7.

The arguments put forth by the Trustee and ComFed are similar but not identical. For instance, the Trustee also argues that the motion to· compel the sale of the property was more in the nature of a motion for contempt. Trustee Brief at 6. However, the Trustee bases its contention that no complaint was necessary on Bankruptcy Rule 9020(b), which sets forth the procedures for criminal contempt. *Id.* at 6–7. The Trustee, as does Lachowetz, also relies on section 105(a) of the Bankruptcy ·Code (11 U.S.C. § 105(a)), which gives bankruptcy judges the authority to enforce its own orders. *Id.* at 7; Lachowetz Brief at 9–10.

As is discussed below, however, a motion for specific performance clearly falls within the ambit of Rule 7001. Neither a "contested matter" nor an action for contempt adequately describes what is involved in this case.

### 2. A Rule 7001 Adversary Proceeding Was Required

It seems evident to this Court that the June 10, 1988 Joint Motion, filed collectively by the Trustee, ComFed and Lachowetz, is a request that the bankruptcy judge or-der the buyers to specifically perform the sale as set forth in the settlement agreement.

It is well established that the granting of a motion for specific performance lies entirely in the discretion of the court, and is determined "according to settled principles of equity...." *Haffner v. Dobrinski*, 215 U.S. 446, 450, 30 S.Ct. 172, 173, 54 L.Ed. 277 (1910); *see also Wesley v. Eells*, 177 U.S. 370, 376, 20 S.Ct. 661, 664, 44 L.Ed. 810 (1900) (specific performance will not be compelled "if under all the circumstances it would be inequitable to do so."). The First Circuit position is substantially similar. *See Curley v. Mobil Oil Corp.*, 860 F.2d 1129, 1135 (1st Cir.1988) (a motion for specific performance of a contract to convey land is usually granted "in the absence of significant equitable reasons for refusing such relief," *citing Allen v. Rakes*, 359 Mass. 1, 267 N.E.2d 628 (Mass.1971)); *Warner v. Rossignol*, 513 F.2d 678, 683 (1st Cir.1975) ("Specific performance is an equitable proceeding."). *See also* 9 L. King, *Collier on Bankruptcy* (MB) § 7001.10, at 7001–23 (1988) (" 'Other equitable relief' as used in Rule 7001(7) should include relief, other than injunctions, traditionally granted only by courts of equity. Accountings and specific performance immediately come to mind.").

Since the relief sought by the motion to compel was equitable in nature, the procedure was governed by Bankruptcy Rule 7001(7), and a complaint was necessary to properly invoke the bankruptcy court's jurisdiction. The petitioners' failure to do so in this case, however, is not fatal.

### 3. The Procedural Defect Constitutes Harmless Error

■ The Trustee and ComFed argue that even if this Court does find that an adversary proceeding was appropriate in this case, "the bankruptcy court's failure to follow the prescribed procedure did not result in prejudice to Appellants and constitutes harmless error under Bankruptcy Rule 9005." Trustee Brief at 10. Bankruptcy Rule 9005, which states that "Rule 61 F.R.Civ.P. applies in cases under the

Code." Fed.R.Civ.P. 61 in turn provides in relevant part:

> No error in either the admission or exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court ... is ground for ... vacating, modifying or otherwise disturbing a judgment or order unless refusal to take such action appears to the court inconsistent with substantial justice.

The buyers' primary argument is that by not initiating an adversary proceeding, Bankruptcy Judge Queenan denied the buyers the opportunity to conduct discovery pursuant to Bankruptcy Rule 7026 (which in turn incorporates Fed.R.Civ.P. 26). Buyers' Brief at 12. The buyers allege that by not allowing discovery, Judge Queenan prevented them from obtaining discoverable facts pertaining to the alleged title defects. The buyers further assert that discovery would have enabled them "to inquire into and obtain from Appellees' evidence, information and documents germane to the case, thus aiding in strengthening buyers' case." Buyers' Brief at 13.

Both sets of appellees assure this Court that the buyers were given full notice of the hearing and opportunity to present and challenge evidence. Trustee Brief at 13; Lachowetz Brief at 10–11. The Trustee argues that the buyers were in possession of all the relevant facts as early as May 1988 and suggests that further discovery would have been pointless. Trustee Brief at 12. The Trustee also contends that the buyers have failed to demonstrate how discovery would have changed the outcome of the hearing held in July 1988. *Id.* Lachowetz agrees that discovery would not have provided any additional information in support of the buyers' position, and adds that the buyers had "ample opportunity to obtain both expert and lay witnesses and testimony to prove their (Appellants') issues at trial." Lachowetz Brief at 9.

There is limited case law on this issue in this district. However, one case offers some useful suggestions as to what constitutes harmless error. A debtor restaurant company brought a motion for turnover in the form of a "Petition for Emergency Hearing." The Commonwealth in Massachusetts, which had seized various of the debtor's properties for delinquent taxes, argued that a proceeding for turnover should be initiated by complaint pursuant to Bankruptcy Rules 7001(1) and 7003. *In re Aegean Fare, Inc.*, 33 B.R. 745, 746 n. 1 (Bankr. D.Mass.1983). While noting the correctness of the Commonwealth's objection, the bankruptcy court decided to proceed on the merits for two main reasons. First, the court concluded that the nature of the debtor's business required swift action to prevent or reduce diminution of the value of the debtor's estate. Second, the court found that the debtor's motion adequately informed the Commonwealth of the issues at hand. The court's decision was bolstered by the fact that the Commonwealth appeared before it "armed with a memorandum with detailed exhibits attached thereto demonstrating its awareness of the facts at hand, the legal matters in issue and the relief requested." *Id.*

Based on a thorough review of the record on appeal and the transcript of the contested July 13, 1988 hearing, this Court concludes that the buyers were not deprived of substantial justice by the bankruptcy judge's failure to require an adversary proceeding. The buyers clearly had notice of the hearing, and an opportunity to prepare memoranda in support of their position. The materials submitted by the buyers reflect a clear awareness of the facts of the matter and an understanding of the issues involved and the relief requested. At the hearing itself, Attorney Joseph Frank, the buyers' counsel, presented evidence in the form of both testimony and exhibits. It is clear to this Court, as it apparently was to the bankruptcy court, that the evidence presented by each party was sufficient for a thorough discussion of the issues at hand. Put another way, the bankruptcy court plausibly concluded that discovery would not have resulted in the development of any further useful evidence.

The buyers' bald assertion that discovery would develop even more germane informa-

tion flies in the face of reality; the focus of the Joint Motion was on the legal significance of virtually undisputed facts. The bankruptcy judge's decision to hear the merits of the Joint Motion did not deprive the buyers of substantial justice.

### B. Standards of Review

The buyers challenge various of the bankruptcy judge's factual and legal findings. This Court's review of the bankruptcy judge's findings of fact are governed by Bankruptcy Rule 8013, which reads as follows:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

The First Circuit has applied this standard in the bankruptcy context most recently in *In re The Bible Speaks* (*Dovydenas v. The Bible Speaks*), 869 F.2d 628, 630 (1st Cir. 1989) (stating that the "clearly erroneous" standard is particularly important when the credibility of witnesses was at issue).

The bankruptcy court's legal findings, however, are subject to *de novo* review by this Court. *See Arnold Printworks, Inc. v. Apkin*, 61 B.R. 520, 521 (D.Mass.1986), *vacated on other grounds*, 815 F.2d 165 (1st Cir.1987); *Liebowitz v. Columbia Packing Co.*, 56 B.R. 222, 224 (D.Mass. 1985), *aff'd*, 802 F.2d 439 (1st Cir.1986); *In re Mazzola*, 23 B.R. 263, 265 (D.Mass.1981) (District Court "must independently determine the correctness of the *law* upon which the bankruptcy court relied in making its factual findings." (Emphasis in the original)).

### C. The Chain of Title to Parcel 2 is Technically Defective

#### 1. The Tax Taking by Chicopee

The purchase and sale agreement signed by the parties on April 19, 1988 gave the buyers ten days to obtain a mortgage commitment from a local bank. On April 29, 1988, Chicopee Cooperative Bank informed the buyers that their construction loan request of $1,150,000 was subject, among other things, to "clear and marketable title to the property with Title Insurance provided." The closing of the purchase and sale was set for May 29, 1989.

Six days before the closing, Attorney Gerard Matthews wrote to Attorney Frank, the buyers' counsel, concerning the results of a title search which he conducted on the property. As he later testified at the July 13, 1988 evidentiary hearing, a search of the Hampden County Registry of Deed records pertaining to Parcel 2 revealed that on August 15, 1929, a small portion of Parcel 2 was taken by the City of Chicopee for failure to pay taxes. Transcript of July 13, 1988 Joint Motion Hearing ("Transcript") at 24–31 (Testimony of Gerard Matthews) (87–40623).

Matthews said that an affidavit was contained in the Registry records which stated that prior to the tax taking, notice was sent to the taxpayer by registered mail. Matthews told Judge Queenan that there were two problems with the taking. First, the affidavit failed to state whether or not there was a return on the registered mailing, so there is no proof that the delinquent taxpayer in fact received notice.

Second, the Registry records reveal that in the year prior to the tax taking, the taxpayer sold the strip of land to a purchaser subject to the payment of back taxes by the taxpayer. There is no indication that the purchaser received any notice from the City of Chicopee. At some time following, the Commissioner of Corporations and Taxation filed an affidavit designating the taking as one involving low-value land. *Id.*

Upon receipt of Attorney Matthews' letter detailing the potential problems, Attorney Frank conveyed the information to the Chicopee Co-operative Bank. On May 31, 1988, two days after the scheduled closing, Chicopee Co-operative informed the buyers that the title offered was unacceptable and

that, as a result, the offer of financing was withdrawn.

### 2. Relevant Statutory and Case Law

A municipal tax taking is governed by the provisions of Mass.Gen.Laws ch. 60, § 53. If a tax is not paid within fourteen days of demand, the tax collector may take such land for the town. The tax collector is first required to give fourteen days notice to the taxpayer. Notice must be given in the same manner as the service of subpoenas on witnesses in civil cases.

Even after land has been taken for taxes, any person having interest in the land retains a right of redemption until such time as a petition for the foreclosure of all rights of redemption is filed in land court. Mass.Gen.Laws ch. 60, §§ 62, 65.

In the case of land certified to be of low value (where the tax commissioner finds the land to be worth less than the taxes owed, and less than $5,000), Mass.Gen. Laws ch. 60, § 79 provides that a municipality may convey good title without the formality of a foreclosure proceeding. The treasurer of the municipality is required to give fourteen days notice by publication and public posting. There is no requirement in section 79 that notice be given directly to the taxpayer or other parties in interest.

The Supreme Judicial Court of Massachusetts first upheld the validity of Mass. Gen.Laws ch. 60, § 79 in *Napier v. City of Springfield*, 304 Mass. 174, 23 N.E.2d 157 (Mass.1939). A taxpayer whose land was taken for taxes and then sold by the treasurer to the City of Springfield under section 79 argued that he was deprived of his property without due process of law. *Id.* at 176, 23 N.E.2d 157. The state's highest court concluded that while due process does require notice prior to the fixing of a property tax, actual notice is not required "in the process of foreclosing the right to redeem...." *Id.* at 179, 23 N.E.2d 157. The court found that the notice provided for in section 79 was adequate. *Id.*

In 1982, the Massachusetts Supreme Judicial Court relied on *Napier* and upheld the constitutionality of Mass.Gen.Laws ch. 60, § 79 in the face of a due process challenge brought by a mortgagor who failed to receive notice of a tax taking of encumbered property by the Town of Burlington. *Guaranty Mortgage Corporation v. Town of Burlington*, 385 Mass. 411, 432 N.E.2d 480 (Mass.1982). Guaranty asked the Supreme Judicial Court to review the constitutionality of section 79 in light of the Supreme Court's decision in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), in which the Supreme Court held that publication was not an adequate substitute for mailed notice to beneficiaries of a trust facing judicial settlement, where the addresses of the beneficiaries were known. The Supreme Judicial Court cited several cases, however, in which other state supreme courts concluded, even in light of *Mullane*, that notice by publication was adequate in tax takings. *Guaranty*, 432 N.E.2d at 486 and cases cited. Such notice was found to be adequate (1) because a taxpayer "should know that the city or town will eventually sell his property if the taxes are not paid," and (2) there is "the need for an efficient procedure which will permit the city or town to sell its land taken for nonpayment of taxes." *Id.*

The buyers strenuously argue that the Supreme Court "cast a cloud over the *Guaranty Mortgage Corp.* holding one year later in the case of *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983)." Buyer's Brief at 15. Indiana law provided for the taking and sale of real property on which taxes had been delinquent for more than fifteen months. The law required notice by public posting and publication, and a certified mailing sent to the owner at the last known address. At the time the dispute arose, there was no requirement that notice be given to mortgagees of such vulnerable property. *Mennonite*, 462 U.S. at 792–93, 103 S.Ct. at 2708–09. The Mennonite Board protested the fact that it was not given notice of the impending tax taking of property on which it held a mortgage. Relying heavily on *Mullane, supra*, the Supreme Court concluded that "[s]ince a

mortgagee clearly has a legally protected property interest, he is entitled to notice reasonably calculated to apprise him of a pending tax sale." *Id.* at 798, 103 S.Ct. at 2711. Accordingly, the Court held that if a mortgagee is identified on a publicly recorded mortgage, then the "constructive notice by publication must be supplemented by notice mailed to the mortgagee's last known available address, or by personal service." *Id.*

It is evident from the Supreme Court's concluding remarks that the holding in *Mennonite* is meant to be read broadly.

> Notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable.

*Id.* at 800, 103 S.Ct. at 2712 (emphasis in the original). Swayed by the sweep of the Supreme Court's language, the buyers assert that *Guaranty* was implicitly overturned, and that any taking and sale of property pursuant to Mass.Gen.Laws ch. 60, § 79 is invalid.

The post-*Mennonite* cases in Massachusetts which discuss the validity of the notice provisions contained in Mass.Gen.Laws ch. 60, § 79 reveal that while the courts in Massachusetts have been slow to apply *Mennonite* to low-value tax takings, they have in fact done so.[3]

In *Christian v. Moody*, 400 Mass. 753, 511 N.E.2d 587 (Mass.1987), the Supreme Judicial Court flatly stated that "[f]ailure to give notice to a mortgagee of record, by personal service or by mail, of a proceeding to sell the mortgaged property for nonpayment of taxes is a denial of due process." *Christian*, 511 N.E.2d at 591–92. In a footnote, the Supreme Judicial Court suggested that the due process concerns raised in *Mennonite* do cast a shadow over the

reasoning used in *Guaranty*. *Id.* at 592 n. 10.

■ In the most recent case, *City of Boston v. James*, 26 Mass.App.Ct. 625, 530 N.E.2d 1254 (Mass.App.Ct.1988), the Appeals Court used language broad enough to vitiate any of *Guaranty*'s remaining precedential value. The case involved a challenge to the City of Boston's taking of tax title on the grounds that Boston's "attempt to make service [on a party in interest] was so ineffectual as to deprive her of due process of law." *City of Boston*, 530 N.E. 2d at 1254. Returning to the seminal case of *Mullane, supra*, the Appeals Court held that

> [t]here was surely a duty to pursue any suggestive source or piece of information disclosed in the papers the city had immediately in hand. The cases, indeed, suggest a duty according to particular circumstances to go further and consult public records or make other ordinary, simple inquiries.

*City of Boston*, 530 N.E.2d at 1256 and cases cited. Although the Appeals Court recognized the "stern limits on the resources" of municipalities available for these circumstances, *id.* at 1256–57, the emphasis of Massachusetts case law in this area is now clearly closer to the Supreme Court's position in *Mennonite* than the Supreme Judicial Court's in *Guaranty*. The conclusion that this Court reaches is that in order to effect a valid tax taking and sale which satisfies the due process requirement of the Fourteenth Amendment to the United States Constitution, a municipality must make all reasonable efforts to notify by mail any persons who might have an interest in the land.

### 3. Chicopee's Tax Taking Was Flawed

In applying the law to this case, it is important to remember that two different statutes are in operation.

The 1929 taking by the City of Chicopee was governed by Mass.Gen.Laws ch. 60,

---

**3.** The first two Massachusetts cases decided after *Guaranty* held that since Mass.Gen.Laws ch. 60, § 79 deals with low value land, it is distinguishable from the Indiana statute invalidated by *Mennonite*. *See Hilde v. Dixon*, 16 Mass. App.Ct. 981, 453 N.E.2d 1232, 1234 (Mass.App. Ct.1983) and *Robertson v. Town of Plymouth*, 18 Mass.App.Ct. 592, 468 N.E.2d 1090, 1093 (Mass. App.Ct.1984).

§ 53, which requires fourteen days notice to the taxpayer. The Registry records show that Chicopee did so. However, in this instance, the taxpayer was not the record owner of the portion of Parcel 2 in question. Chicopee apparently did not give any notice to the purchaser. Under the principles set forth in *Mennonite* and *Christian*, the City's failure to do so represents a defect in the title. This conclusion is consistent with Matthews' representation to the buyers that there was a problem with the title.

Chicopee retained title to the property until 1965, when the city sold it to Lachowetz under the provisions of section 79. Since the unnamed purchaser's right of redemption had not been foreclosed, Chicopee technically violated the requirements of due process by not notifying him, his heirs or assigns prior to the section 79 sale. Moreover, as the above discussion illustrates, mere publication and posting was not adequate to foreclose redemption, and the tax taking by Chicopee in 1929 and subsequent low-value sale violated the due process requirement of the Fourteenth Amendment, and constitutes a defect in the chain of title to Parcel 2.

### 4. Mass.Gen.Laws ch. 60, § 80C Does Not Remove the Title Defect

█ In his "Rulings of Law," Judge Queenan states that even if the title to Parcel 2 is defective, the defect is cured by the language of Mass.Gen.Laws ch. 60, § 80C, which states in relevant part:

When any city or town has conveyed or sold any land under section seventy-nine or section eighty ... and the notice or procedure for the taking and sale or conveyance under this chapter or the instrument or record thereof because of a defect, irregularity, or omission, fails to comply in any respect with any requirement of law relating thereto or the instrument or record thereof shall, notwithstanding such defects, irregularities, or omissions be effective for all purposes to the same extent as though such notice or procedure or the instrument or record thereof had originally not been subject to any such defects, irregularities, or omis-

sions, unless within said period of twenty years a proceeding is commenced on account of such defect, irregularity, or omission....

The one case in Massachusetts which discusses section 80C supports the buyers' contention that the statute does not cure Parcel 2's title defect. In an action to recover possession of land, a lower court ruled that the plaintiff should prevail because a tax taking in the defendants' chain of title failed to include the land in question. The defendants responded by saying that any defects in the tax taking were cured by section 80C. The Supreme Judicial Court upheld the lower court judge, writing that

the statute cannot cure a defect which is founded on a want of title. It is designed to correct defects, irregularities, and omissions *in procedure* or in an instrument of taking. The statute cannot supply title which did not exist at the time of taking.

*Sheriff's Meadow Foundation, Inc. v. Bay–Courte Edgartown, Inc.*, 401 Mass. 267, 516 N.E.2d 144, 146 (Mass.1987) (emphasis in the original).

The defect in this case is in fact founded on a want of title. The evidence shows that in 1929, a demand for back taxes was made on one person when, in fact, the property had been sold to someone else. Although Chicopee may have made demand upon the right person, the City's failure to notify the new owner of the impending taking was a violation of due process. In the words of one commentator, "presumably this is not a defect which is cured by [section 80C]." M. Park & D. Park, 28A *Massachusetts Practice* § 793 at 27 (A. Eno 2d ed. Supp.1987).

Support for this conclusion is found in the treatment of an analogous section of the Massachusetts code. At the conclusion of Mass.Gen.Laws ch. 60, § 37, which deals with liens of taxes on land, the following language appears:

No tax title and no item included in a tax title account shall be held to be invalid by reason of any error or irregularity which

is neither substantial nor misleading, whether such error or irregularity occurs in the proceedings of the collector or the assessors or in the proceedings of any other official or officials charged with duties in connection with the establishment of such tax title or the inclusion of such item in the tax title account.

One exploration of section 37's curative powers took place in *McHale v. Treworgy*, 325 Mass. 381, 90 N.E.2d 908 (Mass.1950). McHale, claiming title to a parcel of land pursuant to a grant of deed by the Billerica town treasurer, sought to have Treworgy remove certain structures from the parcel. Treworgy defended by stating that the title held by McHale was invalid due to a failure by the collector of taxes to accurately describe the land in the deed eventually conveyed to McHale. *Id.* at 381–82, 90 N.E.2d 908.

McHale offered two responses, both relevant here. First, he argued that the language of section 37 excused any error. The Supreme Judicial Court replied that the collector's description, which set forth no metes or bounds, but only made reference to a previously recorded plan, was an error "so substantial and misleading" as to render the deed invalid. *Id.* at 384, 90 N.E.2d 908.

Second, McHale suggested that his title was valid because he obtained the deed from Billerica pursuant to Mass.Gen.Laws ch. 60, § 79, which states in part that "[t]itle taken by a sale under this section shall be absolute...." The court disagreed, stating that "[section 79] only applies ... if the title acquired is a valid one." *Id.* at 385, 90 N.E.2d 908.

More recent support in this vein can be found in *City of Boston v. Ditson*, 4 Mass. App.Ct. 323, 348 N.E.2d 116 (Mass.App.Ct. 1976), *cert. denied*, 429 U.S. 1057, 97 S.Ct. 779, 50 L.Ed.2d 773 (1977). Ditson challenged a tax lien on her property resulting from costs incurred by the fire department while clearing her property of seven year's accumulated rubbish. The Appeals Court agreed with Ditson that the fire department's entry on Ditson's land constituted an illegal search, since the fire department

had ample opportunity to obtain a search warrant but did not do so.

Although the City of Boston ultimately prevailed as to the validity of the lien, the Appeals Court specifically noted that section 37 could not be used to cure the fire department's error. The court concluded that section 37 was designed to relieve cities and towns of the consequences of failing to observe the tax laws "in the most minute particular...." *Id.* at 121 n. 6, 348 N.E.2d 116. A constitutional violation, the Appeals Court said, "cannot be classified as insubstantial...." *Id.*

To this Court's knowledge, only one federal court has been called upon to review the validity of a statute purporting to cure defects in tax titles. In *Fariss v. Anaconda Copper Mining Co.*, 31 F.Supp. 571 (D.Mont.1940), the District Court addressed the effectiveness of a Montana statute which declared that "all tax deeds heretofore issued are legalized and declared to be valid and legal regardless of any error, defect, omission, irregularity or failure to correctly state the amount due in the notice of application for * * * deed." *Id.* at 577. Relying on Montana state cases, the court held that the plaintiff's failure to give notice of her application for a tax title was "a jurisdictional defect appearing upon the fact of [the] deed which renders it a nulity [sic] and open to attack at any time, and one which the healing statute invoked does not cure.... Unless the notice here required is given, the time for redemption is extended indefinitely." *Id.* at 579.

The City of Chicopee's failure to give notice to the purchaser of the property prior to the tax taking was a denial of due process. In the words of the *Fariss* case, there is a "jurisdictional defect" which M.G.L. c. 60, § 80C is not competent to heal. Since the Massachusetts legislature could not have abolished the need for such notice in the first place, it is incapable of remedying its absence retrospectively. *See Fariss*, 31 F.Supp. at 578; 16A Am.Jur.2d *Constitutional Law* 678 (1979) ("[A] curative statute cannot cure retroactively a failure to observe constitutional requirements.... Nor may a curative act operate

so as to deprive a property owner of his property without due process of law."); 23 Am.Jur.2d *Deeds* 191 (1983) ("Insofar, however, as [curative] statutes may impair vested rights, they are unconstitutional.").

### D. The Sellers Did Not Offer Title of the Requisite Quality

#### 1. Title Must Match Terms of Agreement

■ In the Real Estate Agreement drawn up by the parties, the sellers agreed to convey the property "by a good and sufficient Warranty Deed of the SELLERS, conveying a good, record, and marketable title to the same free from all encumbrances," excepting certain details not relevant here. This Court concludes that the sellers have failed to offer title in conformity with the Agreement.

The comparison between title promised and title proffered begins by breaking down the terms of the Agreement. As Judge Queenan correctly pointed out, "clear record" or "record" title and "marketable title" are two different concepts. Transcript at 34. The first refers to the state of the title itself, and the second to its general acceptance to the world at large. Having discussed at some length the defect in Parcel 2's chain of title, it is reasonable to conclude that the title is not "good." [4] However, not all defects make a title unmarketable. It is still necessary to determine whether or not the title to Parcel 2 is marketable under current standards.

As the Supreme Judicial Court has stated repeatedly, "the test of marketability is whether the title is good beyond a reasonable doubt." *Mishara v. Albion,* 341 Mass. 652, 654, 171 N.E.2d 478 (Mass.1961), and cases cited; *see also Mucci v. Brockton Bocce Club, Inc.,* 19 Mass.App.Ct. 155, 472 N.E.2d 966, 969 (Mass.App.Ct.1985), *rev. denied,* 394 Mass. 1102, 475 N.E.2d 401 (Mass.1985). "The doubt is 'such as would cause a prudent man to pause and hesitate before investing his money.'" *Mishara,* 341 Mass. at 654–55, 171 N.E.2d 478, *quot-*

*ing First African Methodist Episcopal Soc. v. Brown,* 147 Mass. 296, 298, 17 N.E. 549 (Mass.1888). In a similar vein, the United States Supreme Court has stated that "it is a settled rule of equity" that a defendant in a suit for specific performance "will not be compelled to take a title about which doubt may reasonably exist or which may expose him to litigation." *Wesley,* 177 U.S. at 376, 20 S.Ct. at 664. The Supreme Court relied heavily on the widely-cited case of *Jeffries v. Jeffries,* 117 Mass. 184 (Mass.1875), in which the Massachusetts Supreme Judicial Court stated that a defendant "ought not to be subjected, against his agreement or consent, to the necessity of litigation to remove even that which is only a cloud upon his title." *Id.* at 187.

Under the principles set forth above, the buyers in this case were not required to accept the title offered by the sellers. The record clearly indicates that the notice given by Chicopee did not satisfy due process requirements insofar as at least one interested party was not notified of the impending taking. Further, recent Supreme Court and Massachusetts case law raises grave doubts about the validity of the statute under which Chicopee sold Parcel 2 to Lachowetz. Given these legal shortcomings, it is entirely reasonable for the buyers to "pause and hesitate" before committing themselves to the purchase of the land. Nor is such caution unique to the buyers in this case. Attorney Matthews testified to the "great deal of controversy among title examiners" over the taking of land without judicial process. Transcript at 27–28. Attorney Matthews also stated that if asked, he would not consider the title marketable. Transcript at 36. One conveyancing authority states that

there is no evident ground for rejecting [a low value tax title] if the record shows that a proper person was assessed, the tax title description is sufficient to convey title, the land court has, upon recorded notice, entered a decree establishing

---

4. There is no dispute that the title to Parcel 1 conforms to the requirements of the Agreement in all respects. The question remaining, to be answered *infra,* is whether or not specific performance should be ordered as to that parcel alone.

title under M.G.L. c. 60, 80B, and a year has elapsed without petition to vacate the decree.

David, *Massachusetts Conveyancers' Handbook* § 5:12.04 (3d ed. 1984), *citing* Mass.Conv.Assoc. Title Std. No. 4. In this case, however, two of those four protections are either not present or are flawed: (1) while the City of Chicopee assessed the right person, it did not give notice to the owner at the time of taking, and (2) no action has been initiated in land court to establish title.

It may well be that sixty years having elapsed, no heir of the purchaser will come forward to redeem the land. Nonetheless, such an event remains a possibility until such time as the right of redemption is foreclosed, a procedure which would require the buyers to initiate litigation in land court. Absent explicit agreement, such a step is not the buyers' responsibility.[5]

### 2. The Buyers' Reason for Protesting the Title is Irrelevant

Although none of the parties briefed this issue in any detail, the Court feels constrained to offer a brief discussion in light of Judge Queenan's explicit but enigmatic finding that "[t]he Buyers' real motive in seeking to avoid performance has nothing to do with the asserted title problems."

■ The rule in Massachusetts is harsh but clear. The tendered deed must conform in all particulars to the terms of the agreement, and the knowledge of the buyers with respect to existing defects is irrelevant. *Siegal v. Shaw*, 337 Mass. 170, 172, 148 N.E.2d 393 (Mass.1958). The right of buyers to refuse a nonconforming title is absolute, even in instances where the buyers assert other reasons for not accepting the deed. *Rubenstein v. Hershorn*, 259 Mass. 288, 293, 156 N.E. 251 (Mass.1927).

A good example of the application of this rule can be found in *Richard v. Saveway Oil Co., Inc.*, 2 Mass.App.Ct. 514, 314 N.E. 2d 923 (Mass.App.Ct.1974). Saveway purchased from Richards certain properties in

Massachusetts, including some personal property and some lease interests. Saveway also contracted to purchase other Richards real estate in New York and New Hampshire. Two years later, Saveway discovered that certain property which it thought it owned was in fact owned by third party lessors operating on the Massachusetts properties. After purchasing the property from the lessors, Saveway demanded that Richards agree to a reduction in the purchase price of the remaining properties. Richards refused and brought an action for specific performance, which the trial judge granted. *Id.*, 314 N.E.2d at 924–25.

The Appeals Court held that even if Saveway, through its attorney, knew at the time of contracting that Richards did not own all the property on the Massachusetts sites, that still did not relieve Richards of delivering a deed in conformance with the agreement. The Court wrote that "the fact that the buyer may have actual or constructive knowledge of an existing encumbrance or other defect in the seller's title is irrelevant. The terms of the written agreement are controlling in such circumstances." *Id.* at 925.

Thus, even though there is some testimony in this case that the buyers' attorney was informed of the tax taking prior to the drafting of the purchase and sale agreement, the buyers were not bound to accept anything less than the agreed upon title. At the time scheduled for closing, the sellers had neither corrected the defect, nor made an offer to do so, and so the buyers were not required to perform their end of the contract.

### E. The Obligation to Purchase the Parcels Was Not Severable

■ The Trustee and ComFed strenuously argue that even if this Court concludes that there was a defect in the title to Parcel 2, the title to Parcel 1 is unsullied and the buyers should be compelled to go through with the purchase of that property. The primary support offered for this view is a

---

**5.** While Judge Queenan is probably correct that the buyers could have purchased title insurance,

that would not permanently solve the fact that the title is unmarketable.

clause in the purchase and sale agreement which stated that if the buyers failed within five months to obtain the permits necessary to construct thirty-nine condominium units on Parcel 2, Lachowetz agreed to take back the property from the buyers. The sellers also state that the testimony of Robert Magnacca, one of the buyers, reveals that the buyers were aware of the possibility that they might end up owning only Parcel 1. Transcript at 75.

The Court's own examination of the record, however, suggests that the purchase and sale agreement is not divisible. The essentially unrefuted testimony of Mr. Magnacca is that while there was the possibility of reverter with respect to Parcel 2, he and the other buyers would not have even approached the sellers if they did not originally think that Parcel 2 offered a reasonable chance to make the project profitable. Transcript at 73–80. Further support that this was a package deal can be found in the general language of the purchase and sale agreement, and in the fact that the buyers applied for a single mortgage on both parcels. In light of the numerous discussions held between the parties in order to structure a joint sale, it is disingenuous of the Trustee and ComFed to argue that the buyers should be content with half a loaf.

The case law in this area supports the buyers. The longstanding rule, as set forth most recently in *Smith v. McAllister,* 1 Mass.App.Ct. 22, 294 N.E.2d 441 (Mass. App.Ct.1972), is that "[w]hen a seller is unable to convey marketable title or is otherwise unable to fulfill his obligations under a contract to sell land, a purchaser will not be compelled to accept a lesser conveyance the seller may offer." *Id.* 294 N.E.2d at 443. This has been the rule in Massachusetts for nearly two hundred years, as is evidenced by the Supreme Judicial Court's statement in *Borden v. Borden,* 5 Mass. 67 (1807):

> And though these claims [of defect] affect only a part, and comparatively a small part, of the bargained premises; yet if there results from them an unavoidable defect of title in the plaintiff, as to the parts of the estate comprised in those items, this circumstance ought to operate a discharge of the defendant from his whole contract, which respects the entire premises; and he is not compelled to accept of a partial performance by the plaintiff.

*Id.* at 75.

Having contracted to purchase together two pieces of property, the buyers were perfectly entitled to refuse the entire deal when one of the two pieces of property was revealed to have faulty title.

### III. CONCLUSION

Accordingly, the buyers' appeal of the Bankruptcy Court's decision is GRANTED, and the order of specific performance is REVERSED. Having reached that conclusion, this Court also GRANTS buyers' motion to recall the Amended Execution and Attachment. The underlying appeal having been decided, the Court need not reach the Trustee and ComFed's motion to vacate this Court's stay of the Bankruptcy Court decision.

It is So Ordered.